**Affirmed and Memorandum Opinion filed February 12, 2019.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-18-00750-CV

_____

## IN THE INTEREST OF D.M.M., A CHILD, Appellant

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Cause No. 2017-03775J**

# M E M O R A N D U M   O P I N I O N

Appellant A.J. ("Father") appeals the trial court's final decree terminating his parental rights to his young daughter D.M.M. ("Damaya")[1] and appointing the Department of Family and Protective Services ("Department") as the child's sole managing conservator. Father challenges the legal and factual sufficiency of the evidence to support (1) the trial court's finding on four predicate grounds and (2) the trial court's finding that termination is in the child's best interest. We affirm.

_____

[1] We refer to the child by the pseudonym "Damaya" to protect her privacy.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Father and A.M. ("Mother") are Damaya's natural parents. Damaya was originally removed from parental care as a result of Mother's independent misconduct. Mother relinquished her parental rights mid-trial and supported Damaya's placement with her mother, Damaya's maternal grandmother, B.A. ("Grandmother").

*Pretrial Removal Affidavit*

When Damaya was less than a year old, the Department received a referral reporting physical abuse to Damaya by her mother based on an incident occurring at Memorial Hermann Memorial City Hospital. The same day, the Department dispatched caseworker Clemmy Eneas-Varence to the hospital. The caseworker later reported the facts she discovered in her investigation in an affidavit filed with the trial court in support of the Department's request for emergency removal of Damaya.

According to the caseworker's affidavit, Mother entered the hospital emergency room complaining of stomach pain. After being admitted and undergoing initial testing, Mother became impatient and sought to leave. Mother had Damaya with her and reportedly placed Damaya's infant carrier on a hospital wheelchair to transport the child. Mother crashed the wheelchair and Damaya fell out, landing face-first on the floor. The healthcare staff attended to Damaya. The investigator reported that the attending physician stated that although the child's CT scan revealed no skeletal injury that "if the child had sustained intracranial injury, it could have resulted in death of the child." The doctor prescribed antibiotics for Damaya's unrelated urinary tract infection.

After the accident Mother initially acted erratically and attempted to remove Damaya from the hospital. Then Mother left the hospital without the child, later

2

returning to attend to her own medical treatment needs. Mother refused to speak to the Department's investigator but stated she would retrieve Damaya from the Department's care after Mother got out of the hospital.

The Department's investigator contacted Grandmother, who stated that she had been Damaya's primary caregiver and the primary caregiver of Mother's other children. After the investigator told Grandmother that Mother was expected to come to the Department's facility after she was discharged that night, Grandmother allegedly stated that Mother was dying and would not be able to come. Mother was discharged later the same night. Mother never appeared at the Department's facility.

Based on information the Department gathered from Mother's sister ("Aunt"), the investigator reported that, days before, Mother had called Aunt to pick her up from Dallas, where Mother had been residing. Aunt picked up Damaya from the home of the child's paternal grandmother in Dallas, then she picked up Mother. After visiting with providers at the hospital, the investigator called the phone number provided by Aunt for the paternal grandmother. A young lady answered the phone claiming to be Father's sister. The young lady stated that Mother had dropped Damaya at her home for two days and then returned for the child, that Father was not in jail, and that Father would return the call in 30 minutes. Father did not return the call. Based on her findings of an immediate and continuing danger to Damaya, the investigator believed the Department needed to take emergency custody of the child.

*The Department's Protective Measures, Petition, and Service Plan*

The day after the hospital incident, the Department secured Damaya in foster care with intervenors B.R. ("Foster Mother") and K.R. ("Foster Father"). Three days later, the Department filed a petition seeking sole managing conservatorship

of Damaya and the termination of Mother's and Father's parental rights to the child. In the petition, the Department also sought an emergency order for temporary sole managing conservatorship of Damaya.

Due to uncertainty concerning Father at the time of filing, the Department also requested the court to determine parentage. The petition sets out alternative allegations to terminate paternal rights of Father and "Unknown Father." Ten days after the Department filed its petition, the court held a full adversary hearing on the Department's request for temporary orders, and issued its "Temporary Order Following Adversary Hearing" ("Temporary Order"). The Temporary Order includes an "appearances" section identifying the parties and the status of notice that they were provided for the hearing. As to Father, the notice states "although duly and properly notified, did not appear and wholly made default." In the Temporary Order, the trial court specifically established the actions necessary for Father to obtain the return of Damaya and ordered Father to comply with the original or any amended service plan during the pendency of this suit.

Within a month, the Department created and filed a Family Service Plan pertaining to Father. Evidence shows that initially Father was cooperating with the Department and wanted custody of Damaya. The Family Service Plan required Father to complete various tasks, including submitting to a paternity test. All further tasks and participation turned on Father's completion of the paternity test.

Documents admitted into evidence at trial indicate that on August 12, 2017, Father was arrested pursuant to a warrant for aggravated robbery and possession of a controlled substance. The Department ultimately located and served Father with the suit on September 17, 2017, in a Dallas jail. Shortly thereafter, the court issued an order for a DNA screening. The results confirmed Father's paternity. Father signed the Family Service Plan on November 7, 2017.

4

*Trial*

Trial evidence shows Father was incarcerated pending his criminal trial for some but not all of the time leading up to the trial in this case. Father was represented by counsel at trial, but he did not personally appear or testify at trial.

During the trial, the Department introduced the following evidence germane to Father's case: (1) records related to establishing Father's paternity, (2) Father's felony indictment with accompanying arrest warrant relating to an aggravated robbery occurring on or about July 18, 2017, (3) Father's felony indictment with accompanying arrest warrant relating to possession of heroin on or about July 19, 2017, (4) the Family Service Plan signed by Father and the Department's representative, and (5) other records containing information about Father and his conduct and efforts following Damaya's removal, including the reports of the Court Appointed Advocate and the Department's Permanency Report.

Mother, Grandmother, Department unit supervisor Shamaila Khan, Child Advocate coordinator Susana Arredondo, and Foster Mother testified as to facts related to Father's case.[2] The evidence included the following:

- Mother testified about the circumstance of Damaya's removal, her history with the Department, including the removal of two other children who were being cared for by her own mother, and her ongoing drug problems. Mother testified that she did not have a relationship with Father. She testified that Father had never helped her in caring for Damaya and that only her mother, Grandmother, had helped. She testified that Father was in and out of jail for aggravated robbery. Mother testified that "marijuana and cocaine" were Father's "drug[s] of choice."

- Grandmother testified that she was the primary caretaker of

---

[2] The Department also called two other witnesses: Tiffany Nguyen, records custodian for the Wellness Counseling Center, and Bruce Jefferies with National Screening Center, National Assessment Center, who testified as to facts concerning Mother's drug use.

5

Damaya but that she and Mother shared responsibilities in caring for the child. She testified that she called the police when Mother came over and took Damaya to Dallas. Grandmother admitted that she had no ability to prevent Mother from taking the children out of her care.

- Department caseworker and unit supervisor Shamaila Khan testified that Father had signed the Family Service Plan, and confirmed that at first Father was cooperating with the agency.

- Khan testified that Father was not at fault in relation to the events that brought Damaya into custody. She knew of Father's recent charges but admitted that she knew of no convictions.

- Khan testified that someone at the Department went over the Plan in the fifth month and that he had participated by phone. Khan testified that the Department made efforts to assign Father a courtesy worker in Dallas, but was unable to do this because Father failed to provide an address or active phone number.

- Khan further testified that Father had provided the name of a relative and that the Department had followed up with the relative who, in early conversations, appeared to be willing to take on Damaya. The relative ceased contact about four months prior to trial, before the Department could conduct a home study

- The Child Advocate and the Foster Parent both testified about Damaya's physical and emotional condition throughout the course of the Department's conservatorship.

The trial court determined Father's parental rights should be terminated pursuant to the predicate findings under Family Code sections 161.001(b)(1)(D), (E), (N), and (O), and appointed the Department as the child's sole managing conservator. The trial court approved the child's placement in the foster home. In its final decree for termination, signed August 2, 2018, the trial court stated termination of Father's parental rights was in the child's best interest.

## II. ISSUES AND ANALYSIS

Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(b)(1); and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2) (West Supp. 2016); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009).

Father raises five issues on appeal. In his first, second, third, and fourth issues, Father challenges the trial court's findings under sections 161.001(b)(1)(D), (E), (N) and (O) of the Texas Family Code — the predicate grounds upon which the trial court based its termination-of-parental rights decision. In his fifth issue, Father challenges the trial court's finding that termination of his parental rights is in child's best interest.

### A.    Standard of Review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.–Houston [14th Dist.] 2012, no pet.). Despite the constitutional magnitude of parental rights, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."). Due to the severity and permanency of the termination of parental rights, the law imposes a heightened burden of proof, requiring clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be

established." Tex. Fam. Code Ann. § 101.007 (West 2014); *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.–Houston [14th Dist.] 2008, no pet.).

In conducting a legal-sufficiency review, we consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *See In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d at 25. We presume the factfinder resolved disputed facts in favor of the finding if a reasonable factfinder could do so, and we disregard all evidence a reasonable factfinder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266.

In reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.* We give due deference to the factfinder's findings and we will not substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109.

## B. Predicate Termination Grounds

### 1. Is the evidence legally and factually sufficient to support the trial court's finding that all elements of section 161.001(b)(1)(O) have been satisfied?

Proof of the predicate ground for termination under section 161.001(b)(l)(O) suffices if the trial court finds by clear and convincing evidence that the parent has:

> (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child;

Tex. Fam. Code Ann. § 161.001(b)(1)(O) (West). Father does not challenge that Damaya was removed under Chapter 262 for abuse or neglect, or that Damaya was in the Department's conservatorship for the requisite period of time or that the trial court ordered Father to comply with the terms of the Department's Family Service Plan. *See* Tex. Fam. Code Ann. §§ 161.001(b)(1)(O); 263.101–106. In addition to submitting to paternity testing, Father had to perform the following requirements:

- maintain stable and sanitary housing;
- provide proof of housing "by providing a lease agreement to the caseworker[;]"
- secure and maintain legal employment;
- provide the caseworker with "proof of income documentation as well as "[d]ocumentation of any additional sources of income (i.e., governmental assistance programs, child support, etc.)[;]"
- participate in giving truthful information;
- attend "all meetings, court hearings, visitations, and other planning sessions regarding [Father's] children[;]" and

9

- maintain contact with the current caseworker.

The record indicates that Father may have participated in the creation of the Family Service Plan at a conference with the Department the day before he was incarcerated and signed the plan soon after his incarceration. The record contains no evidence that Father did much else in furtherance of the plan and ample evidence shows that Father violated the plan. Department unit supervisor Khan testified that Father participated by phone in one conference with the Department "in the fifth month," but Khan was unaware of any further contact. Father made communication difficult because he did not provide contact information to the Department caseworker. The caseworker (Khan) testified that to her knowledge Father never visited or communicated with the child. According to the caseworker, Father did not accept the responsibility of parenting.

In response to questioning about Father's completion of the goal that "Parent will show the ability to parent and protect the child," Khan testified:

Q So in the service plan goals that [Father] was required to undertake, he was required to show an ability to parent and protect the child.
A Correct.
Q Did he do that?
A No.

By failing to provide the Department with contact information and by failing to maintain contact with the Department, Father failed to comply with the Plan.

In his brief, Father has raised legal and factual sufficiency challenges to the trial court's finding under subsection (O). The substance of Father's briefing does not establish compliance with the Family Service Plan, but instead proffers excuses for his failure to comply. Father argues that the Department did not make accommodations to enable him to successfully complete the plan or encourage Father to initiate contact with his daughter. Father complains that the

Department's assessment of his performance was inherently subjective.

The law places the burden of complying with the court order on the parent. *In re D.N.*, 405 S.W.3d 863, 878 (Tex. App.–Amarillo 2013, no pet). Courts do not measure the "quantity of failure" or "degree of compliance." *Id*. at 877. Rather, courts determine whether a parent has failed to comply. *In re M.C.G.*, 329 S.W.3d 674, 675 (Tex. App.–Houston [14th Dist.] 2010, pet. denied) (holding a parent's reasons or excuses for failing to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child are not material to the sufficiency of the evidence to support a finding under section 161.001(1)(O)); *see also In re A.W.*, No. 01–15–01030–CV, 2016 WL 3022824, at *7 (Tex. App.–Houston [1st Dist.] May 26, 2016, no. pet.) (mem. op.) (holding substantial compliance with court-ordered service plan may be insufficient to avoid termination).

Given Father's failure to perform most of the requisite actions, we conclude the record evidence is legally and factually sufficient to support the trial court's finding under subsection (O).

### 2. Does the affirmative defense of subsection (d) of section 161.001 of the Texas Family Code apply?

The trial court's termination order includes language that tracks the newly created affirmative defense in section 161.001(d) of the Texas Family Code, which provides:

> (d) A court may not order termination under Subsection (b)(1)(O) based on the failure by the parent to comply with a specific provision of a court order if a parent proves by a preponderance of evidence that:
>
> (1) the parent was unable to comply with specific provisions of the court order; and

11

(2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent.

Tex. Fam. Code Ann. § 161.001 (West, Westlaw through 2017 1st C.S.). The trial court determined that Father did not raise subsection (d). Additionally, the trial court stated, if Father did present such an affirmative defense, then there was no proof by a preponderance of the evidence to satisfy either part (1) or part (2) of subsection (d). Under our recent precedent addressing the applicability of the provision to cases filed before but tried after the amendment's effective date, the trial court would have been precluded from excusing Father's compliance with subsection (b)(1)(O) by operation of subsection (d) if the petition were filed before the September 1, 2017 effective date of the amendment adding subsection (d). *See Interest of S.J.N.*, 14-18-00529-CV, 2018 WL 6494256, at *5 (Tex. App.— Houston [14th Dist.] Dec. 11, 2018, pet. denied) ("Section 161.001(d) applies only to suits filed on or after its effective date of September 1, 2017") (mem. op.). The petition in today's case was filed on July 17, 2017, two months before the effective date. Therefore, the subsection does not apply. *See id*.

As noted above, without specifically invoking subsection (d), Father challenges the sufficiency of evidence to support the predicate finding under subsection (O) by a series of excuses. Presuming without deciding that some common law affirmative defense to compliance was available in our jurisprudence before the enactment of subsection (d), we consider whether Father preserved the issue for appellate review. The record shows Father failed to raise any affirmative defense based on the proffered excuses in the trial court. Father did not ask the trial court to consider Father's excuses in any pleading, at trial, or in any pre- or post-trial motion. Therefore, even if, the trial court could have considered the excuses Father raises on appeal, Father failed to preserve error on them and so

forfeited these arguments. *See 950 Corbindale, L.P. v. Kotts Capital Holdings Ltd. P'ship*, 316 S.W.3d 191, 196 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

Because the record contains legally and factually sufficient evidence to support the trial court's findings under subsection (O), we need not address Father's arguments that the evidence is insufficient to support the trial court's findings under section 161.001(b)(1)(D), (E), and (N). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest."). Thus, we need not and do not reach Father's first, second, and third issues.

**Best Interest of the Child**

In his fifth issue, Father challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of his parental rights is in Damaya's best interest. Texas courts presume that keeping children with their natural parents serves the child's best interest. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). The Department carries the burden of rebutting that presumption. *Id.* Proof of acts or omissions under section 161.001(b)(1) is probative of best interest. *See In re S.R.*, 452 S.W.3d at 366. In determining the child's best interest the trier of fact may consider the following non-exclusive factors known as the *Holley* factors:

> (1) the child's desires;
> (2) the child's present and future physical and emotional needs;
> (3) the present and future emotional and physical danger to the child;
> (4) the parental abilities of the person(s) seeking custody;
> (5) the programs available to assist those persons seeking custody in promoting the child's best interest;

(6) the plans for the child by the individuals or agency seeking custody;

(7) the stability of the child's home or proposed placement;

(8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and

(9) any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re U.P.*, 105 S.W.3d at 230; *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to consider in evaluating parents' willingness and ability to provide children with a safe environment). A best-interest finding does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371–72.

### 1. The child's desires or evidence of bonding

Damaya, twenty-two months old at the time of trial, was too young to testify or verbally express her desires. In this circumstance, the factfinder may consider that the child has bonded with the foster family, is well cared for by the foster family, and has spent minimal time with the parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Child advocate Arrondo testified that, based on her observations, Damaya was "extremely attached" to the foster parents. The child takes directives from both foster parents. Foster Mother testified that Damaya and their other child are "[t]wo peas in a pod. They get along great. They're little troublemakers together." Father asserts on appeal that he is bonded to Damaya. We do not dispute that Father loves Damaya, nor do we discount the possibility that Father feels some bond with the child, but there is no evidence in the record that Damaya has ever spent any appreciable time with Father. The record shows Damaya shares a bond with her entire foster family.

### 2. The child's physical and emotional needs, now and in the future

14

At trial, Mother testified that Father had made no contribution towards the parenting of Damaya up to the time the child remained in Mother's custody. A factfinder may infer from a parent's past inability to meet the child's physical and emotional needs the parent's inability or unwillingness to meet the child's needs in the future. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Even if we were to presume the trial court discredited Mother's testimony, the record contains no evidence of Father's ability to meet Damaya's present and future physical and emotional needs. Foster Mother testified that when she first took custody of Damaya, the child would eat meals as if she might not be fed again. In assessing the child's best interest, the trial court reasonably could have weighed this evidence in favor of terminating Father's parental rights. *See id*.

3. *The emotional and physical danger to the child, now and in the future*

Mother testified that Father used marijuana and cocaine. Father's criminal records show that he was arrested for possession of heroin shortly after Damaya was taken into the Department's care. A parent's drug use supports a finding that termination is in the best interest of the child. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.–Fort Worth 2007, no pet.). The factfinder can give "great weight" to the "significant factor" of drug-related conduct. *In re K.C.*, 219 S.W.3d 924, 927 (Tex. App.–Dallas 2007, no pet.); *see also In re B.G.*, No. 14–14–00729–CV, 2015 WL 393044, at *7 (Tex. App.–Houston [14th Dist.] Jan. 29, 2015, no pet.) (mem. op.) (considering a parent's criminal and drug histories in affirming the decision that termination was in the best interest of a child). Accordingly, the trial court reasonably could have weighed this factor in favor of terminating Father's parental rights. *See id*; *See also In re V.V.*, 349 S.W.3d 548, 553–54 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("A lack of all contact with a child without any proffered excuse and no effort to ensure her safety—coupled with criminal history

15

and incarceration—is sufficient to support a best-interest finding.”).

### 4. *The parental ability of the individuals seeking custody*

The only evidence presented at trial about Father's ability to parent was that he had been unsupportive before Damaya was removed from Mother's care. Foster Mother testified that she had a degree in family and child development and that she used to train foster parents. Foster Mother formerly worked as a preschool teacher and already is foster parent to another child. In assessing parenting ability, the trial court reasonably could have weighed this factor in favor of terminating Father's parental rights

### 5. *Plans for the child and stability of the home of proposed placement*

In his appellate brief, Father states "The father's plans are unknown." When questioned about her plans with respect to Damaya, Foster Mother testified that the foster parents want to adopt Damaya. According to Foster Mother, the foster parents planned "to give [Damaya] everything we possibly can." Foster Mother testified that they "want her to be successful," and "want to give her love and we want to be good parents."

The stability of the proposed home environment stands as an important consideration in determining whether terminating parental rights serves a child's best interest. *See In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.–San Antonio 2014, no pet.). Texas courts recognize as a paramount consideration in the best-interest determination the child's need for permanence through the establishment of a "stable, permanent home." *See K.C.*, 219 S.W.3d at 931. Therefore, evidence about the child's present and future placement informs the best-interest determination. *See C.H.*, 89 S.W.3d at 28.

*6. Noncompliance with subsection (O) and Excuses for Noncompliance*

Evidence supporting termination under the grounds listed in section 161.001(b)(1) also can be considered in support of a finding that termination is in the child's best interest. *See C.H.*, 89 S.W.3d at 27 (holding the same evidence may be probative of both section 161.001(b)(1) grounds and best interest). In determining the best interest of the child in proceedings for termination of parental rights, the trial court properly may consider that the parent did not comply with the court-ordered service plan for reunification with the child. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013).

Father complains that the Department did not make accommodations to enable him to successfully complete the Family Sevice Plan. Father also complains that the Department did not encourage him to initiate contact with Damaya. Father does not explain why he needed encouragement to seek contact with his daughter or why he was unable or unwilling to initiate contact without being encouraged. The trial evidence showed that had Father been incarcerated in Harris County, the Department would have provided greater assistance. But Father accepted the plan while he was incarcerated elsewhere and agreed to comply with its terms. Father demonstrated an ability to communicate with the Department, yet he points to no evidence to suggest he ever requested or needed accommodations.

*7. Conclusion on Best Interests*

Applying the applicable *Holley* factors to the evidence, we conclude that legally and factually sufficient evidence supports the trial court's finding that termination of Father's parental rights is in Damaya's best interests. *See In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.–Fort Worth 2006, no pet.) (considering the parent's drug use, inability to provide a stable home, and failure to comply with a family-service plan in holding the evidence supported the best-interest finding).

17

Based on the evidence presented, the trial court reasonably could have formed a firm belief or conviction that terminating Father's rights served Damaya's best interests so that she quickly could achieve permanency through adoption. *See In re T.G.R.–M.*, 404 S.W.3d 7, 17 (Tex. App.–Houston [1st Dist.] 2013, no pet.); *M.G.D.*, 108 S.W.3d at 513–14.  Accordingly, we overrule Father's fifth issue.

We affirm the judgment of the trial court.


/s/    Kem Thompson Frost
Chief Justice

Panel consists of Chief Justice Frost and Justices Jewell and Bourliot.